UNITED STATES of America, Plaintiff,

v.

Edward Lee DONNES, Defendant.

No. CR89–0101J.

United States District Court,
D. Wyoming.

Oct. 18, 1990.

John Barksdale, U.S. Atty., Casper, Wyo., for plaintiff.

Douglas G. Madison, Cheyenne, Wyo., for defendant.

## MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

ALAN B. JOHNSON, District Judge.

On March 28, 1989, the defendant Edward Donnes left Billings, Montana, en route to Sheridan, Wyoming. He and his traveling companions were driving a U-Haul truck and a 1973 Ford Galaxy. He was accompanied by his half brother, Jack Welch, and a friend, Peggy O'Donnell. The U-Haul had been rented in O'Donnell's name. The defendant and O'Donnell testified that the purpose of their trip was to retrieve the defendant's belongings located in a rented house and garage in Sheridan, where the defendant had lived for "quite a while" with his then-girlfriend, Cheryl Flippin. The evidence indicates that he had lived there continuously until at least February of 1989. The residence was rented by Flippin, using the name Dianne Whittier, from a Mr. Jack Marousak. Prior to leaving the house in March of 1989, Donnes and Flippin put a hasp and padlock on the front door to secure the premises.

On March 23, 1989, while Donnes and Flippin were gone, a search warrant was executed on the house at 162 Montana Street in Sheridan, the house in which the two had resided. An arrest warrant for Flippin had also been issued by the Wyoming Department of Criminal Investigation. Marousak was informed that the warrant was being served, and attempted to open the padlock on the front door for the officers with a key Flippin had sent him. The key would not open the lock, and members of the Wyoming Department of Criminal Investigation used bolt cutters to gain entry. After the search, which yielded contraband weapons, Marousak asked the officers if he could resecure the premises. The officers said he could, and he and a friend, Bill Bertrand, placed a new padlock on the door.

On March 28, Flippin had gone to the state of Oregon. Donnes parked O'Donnell's Ford in the driveway at 162 Montana, and the U-Haul was parked approximately seven blocks away. He was in possession of a key to the front door and a padlock key. When the padlock key did not work, Donnes forced the door open, and the three entered.

At approximately 1:20 p.m., the Sheridan Police Department received a call from a neighbor of the residence, reporting that the three individuals had forced their way into the house. Lieutenant Chris Sears and Sergeant T.G. Walker were dispatched to the scene. Walker ordered Donnes, Welch and O'Donnell out of the house and proceeded to check their identification. Though Donnes claimed to have Whittier's (Flippin's) permission to enter the house, he could provide the officer with neither an address nor phone number with which to contact her. The officers noted that the door had been forced open and that a coffee can of change was resting on the bumper of the car.

During the questioning, Lieutenant Robert Green of the Sheridan Police Department arrived at the house and received the information from Walker. Donnes told Green that he had permission to be in the house from Whittier, who Green knew to be Flippin. Green then decided to take the three suspects to the police station to check their stories and attempt to verify that Donnes had permission to enter the house. All three were transported to the station, and after further questioning, arrested for burglary in violation of Wyo.Stat. § 6-3-301, and for being accessories after the fact in aiding and abetting a fugitive, in violation of Wyo.Stat. § 6-5-202.

At some time during the questioning at the house, Marousak and Bertrand arrived. They remained in their vehicle until the suspects had been taken to the station, and then approached Sears, who had remained at the house. Marousak expressed his concern to Sears about some belongings he had in the house, and said he wished to check to see if anything was missing. Sears entered the house ostensibly to further investigate the suspected burglary and look for other suspects, and Bertrand and Marousak followed him in. Sears testified

that he looked throughout the house and discovered no one. The evidence indicates that the living room was cluttered with boxes and furniture. Bertrand stated that, while looking around in the living room, he noticed a snowmobile glove lying on the floor. The glove was "bulging way out" and Bertrand, being suspicious, picked it up and looked inside. Inside the glove he saw a syringe and immediately gave the glove to Sears.

Suspecting the syringe was narcotics paraphernalia, Sears removed it and a camera lens case which was also in the glove. Sears opened the case and discovered a plastic bag containing two smaller bags and some "bindles." These containers were subsequently determined to hold methamphetamine.

Later the same afternoon, Sears and Sheridan Police Officer Wilson were instructed by Green to impound the Ford.[1] Green testified that, at the time he ordered the impound, he was aware that drugs had been located in the house, and that two guns were found in the car. Green did not know how the guns had been discovered and did not remember personally seeing them in the car. Sears also testified that he could not remember seeing the guns in the car, but that the rifle was laying on the floor in the backseat, in its scabbard. Sears stated that the car was "inventory" searched while still in the driveway, and was later towed to the SPD impound facility, where it was inventoried again. In the initial search, the officers discovered the .2506 rifle and, under the front seat of the car, a .380 caliber pistol. Both items were included on the department's inventory form.

On September 22, 1989, Donnes was indicted for transporting firearms and ammunition while having a felony Information filed against him, in violation of 18 U.S.C. § 922(n), knowingly and intentionally possessing methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and using and carrying a firearm to commit a felony, in violation of 18 U.S.C. § 924(c).

## DISCUSSION

■ Donnes now asks the Court to exclude from evidence the contraband discovered at the house and the guns discovered in the Ford. Donnes contends that both searches, conducted without attending search warrants, violated his Fourth Amendment right to be free from unreasonable searches and seizures. The Fourth Amendment, with few exceptions, protects a citizen's right to privacy by prohibiting police from conducting searches or seizures without first obtaining a warrant issued upon probable cause. "The security of one's privacy against arbitrary intrusion by the police—which is at the core of the fourth amendment—is basic to a free society." *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). To give effect to the fourth amendment's guarantee against unreasonable searches and seizures, and to deter illegal police conduct, the court must apply the exclusionary rule and suppress any evidence unconstitutionally obtained. *Nix v. Williams,* 467 U.S. 431, 442–43, 104 S.Ct. 2501, 2508–09, 81 L.Ed.2d 377 (1984).

## STANDING

■ The Government contends initially that the defendant lacked standing to challenge the validity of the searches. When challenging the propriety of a search, the defendant has the "burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). This determination is made by the Court by considering two primary factors; whether the defendant had an actual subjective expectation of privacy in the area searched and whether society is prepared to recognize such an expectation as reasonable. *United*

---

1. Green also testified that he directed Wilson and Sears to locate and search the U–Haul. It was located and searched by Wilson without a warrant, for the express purpose of locating stolen property. That search has not been challenged because all it yielded was some ammunition, which the government does not intend to introduce at trial.

States v. Erwin, 875 F.2d 268, 270 (10th Cir.1989), citing California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988). In answering these questions, the Court can consider whether the defendant would use "precautions customarily taken by those seeking privacy," and the way in which the searched area had been used. United States v. Skowronski, 827 F.2d 1414, 1418 (10th Cir.1987). The mere introduction of incriminatory evidence against a particular defendant is not enough to establish that a person's rights have been violated. Alderman v. United States, 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969). "The 'ultimate question' is 'whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances.'" United States v. Leary, 846 F.2d 592, 595 (10th Cir.1988), quoting Rakas, 439 U.S. at 152, 99 S.Ct. at 435.

### 1. Standing to Challenge the Car Search.

■ At the close of the evidence on standing, the Government conceded that the defendant had a privacy interest in the vehicle sufficient to invoke Fourth Amendment protections. Nonetheless, the Court will address the issue. Testimony was presented by the defendant and O'Donnell on the question of Donnes's control over the Ford. The pertinent inquiry is whether he adequately showed lawful possession and control to confer standing. United States v. Obregon, 748 F.2d 1371, 1375 (10th Cir.1984). Mere physical possession of a vehicle at the time of a search does not give a defendant standing. United States v. Arango, 912 F.2d 441, 444 (10th Cir. 1990). The defendant must, at a minimum, "state that he gained possession from the owner or someone with the authority to grant possession." Arango, 912 F.2d at 445. In Rakas, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12, the Court said that a defendant

who owns or lawfully possess or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.

Id. In United States v. Erickson, 732 F.2d 788 (10th Cir.1984), the Tenth Circuit addressed a situation where the defendant had possession of a plane and its keys, but failed to prove that he had permission or authority to possess, use or fly the aircraft. Where the defendant fails to show lawful possession, the court found, he has also failed to prove any legitimate expectation of privacy. Likewise, in Obregon, 748 F.2d at 1375, the court found that a defendant had no legitimate expectation of privacy in a rental car where he could not show that the rental company had allowed him to operate the car. And in Arango, 912 F.2d at 444–46, the court held that the defendant's showing that he had obtained a truck from a person other than the registered owner, with no further proof that the person had lawful possession, was not sufficient to confer standing.

■ The facts in the present case differ from those in the preceding instances, in that Donnes and O'Donnell testified as to the ownership and control of the vehicle. Donnes testified that he often drove the vehicle with the permission of O'Donnell, and that he was keeping some of his belongings, tools and some clothes, in the car with O'Donnell's permission. Her testimony was consistent; that the 1973 Ford Galaxy did belong to her, that Donnes had driven the vehicle many times prior to March 28, 1989, that he had her permission to drive and that he had control of the vehicle at that time. In United States v. Miller, 821 F.2d 546, 548–49 (11th Cir. 1987), the circuit court was faced with a similar situation. The defendant had borrowed an automobile from a friend who owned it. The court held that a person may have a legitimate expectation of privacy in a vehicle without having an actual ownership interest in the vehicle, and cited a number of circuits which have held the same. Id. at 549. This Court agrees that a legitimate expectation of privacy may exist in property to which the defendant has no ownership interest. It is clear from the evidence that Donnes had control and lawful possession of the Ford, and the Court finds that his expectation of privacy was reasonable.

## 2. Standing to Challenge the Search of the House.

■ The question of whether Donnes had a legitimate expectation of privacy in the house at 162 Montana is not as close a call. The Supreme Court's reasoning in *Minnesota v. Olson*, —— U.S. ——, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), is controlling. In *Olson*, the Court held that a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* at ——, 110 S.Ct. at 1687. The Court reaffirmed its holding in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), that a place need not be a person's home before that person may have a legitimate expectation of privacy in it.

> We do not question the conclusion in *Jones* that the defendant in that case suffered a violation of his personal Fourth Amendment rights if the search in question was unlawful.... We think that *Jones* on its facts merely stands for the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place.

*Olson*, —— U.S. at ——, 110 S.Ct. at 1688, citing *Rakas*, 439 U.S. at 141–42, 99 S.Ct. at 429–30.

The evidence in this case supports a finding that Donnes had a subjective expectation of privacy in the house, and that it was reasonable. Donnes and Flippin lived in the house continuously for several months, until a few weeks before March 28. Before leaving the house, Donnes had taken steps to secure it, boarding parts up and attaching a new hasp and lock on the front door. He had furniture, clothes and other belongings in both the house and garage. Donnes had keys to both the front door deadbolt and padlock.

Flippin testified that she had lived in the house since September of 1988. She stated that Donnes had lived with her continuously for a long period of time. She confirmed that he had belongings in the house, and that he had keys to the house, could come and go when he wished, and could exclude persons from or invite persons to the house.

The government elicited testimony from Marousak that he had never received rent from Donnes, and in fact had never seen him. He stated further that he had not given Donnes permission to enter the house on March 28, 1989, and was in the process of procuring an eviction notice for Flippin. Even assuming the truth of these statements, they do not refute that Donnes had a reasonable expectation of privacy.

Marousak's testimony, however, is somewhat suspect. Though he first testified that the rent had last been paid on February 15, 1989, Flippin stated that it had been paid through April 13, and Marousak conceded on cross examination that that may well be the case. In fact, he testified that he wasn't sure on precisely what date the rent was due. And though Marousak denied getting any phone calls from Flippin after Donnes had been arrested, he remembered one on cross examination, in which she had asked him to call the police and inform them that Donnes did have permission to be in the house.

In light of all the circumstances, the Court is satisfied that Donnes has met his burden of establishing that he maintained a reasonable expectation of privacy in the house at 162 Montana.

## DISCOVERY OF THE DRUGS

■ Because the evidence presented to the Court suggests that the glove in which the drugs and paraphernalia had been placed was discovered by Bertrand, and not by any of the police officers at the scene, the question arises as to whether the exclusionary rule is applicable. By its own terms, the Fourth Amendment proscribes unreasonable searches and seizures by government or state actors. The Supreme Court has held that the Fourth Amendment is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the par-

ticipation or knowledge of any governmental official.'" *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984), quoting *Walter v. United States*, 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980). Consequently, the Fourth Amendment does not prohibit a search or seizure if it is conducted by private person not acting as a government agent, nor in concert with an official of the government. *United States v. Smith*, 810 F.2d 996, 997 (10th Cir.1987); *Greco v. Haliburton Co.*, 674 F.Supp. 1447 (D.Wyo. 1987).

■ A search by a private individual may, however, come within the purview of the Fourth Amendment if "a government official affirmatively facilitates or encourages an unreasonable search performed by a private person." *Specht v. Jensen*, 832 F.2d 1516, 1523 (10th Cir.1987). The decision as to whether a private person performs a search as an instrument or agent of the state is to be made by the Court in light of all of the circumstances on a case-by-case basis. *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir.1989); *United States v. Andrini*, 685 F.2d 1094, 1097 (9th Cir. 1982). The party objecting to the search has the burden to establish that the government involvement was significant enough to change the character of the search. *United States v. Feffer*, 831 F.2d 734, 739 (7th Cir.1987); *United States v. Snowadzki*, 723 F.2d 1427, 1429 (9th Cir. 1984).

■ In *Pleasant v. Lovell*, 876 F.2d at 797, this circuit adopted the Ninth Circuit's analysis in *United States v. Miller*, 688 F.2d 652 (9th Cir.1982). In *Miller*, the court stated:

[T]here is no bright line that distinguishes instances of "government" conduct from instances of "private" conduct, and that we should refer to certain general principles when analyzing cases in the "gray area." ...

While a certain degree of governmental participation is necessary before a private citizen is transformed into an agent of the state, *de minimis* or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search or seizure will not subject the search to fourth amendment scrutiny. The government must be involved either directly as a participant or indirectly as an encourager of the private citizen's actions before we deem the citizen to be an instrument of the state....

From our review of earlier cases, we discerned that two critical factors in the "instrument or agent" analysis are: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends.

*Id.* at 656–57 (citations omitted) quoting *United States v. Walther*, 652 F.2d 788 (9th Cir.1981). As the court noted, however, this is not a bright line rule; that knowledge plus acquiescence necessarily equals instrumentality or agency. *See also United States v. Koenig*, 856 F.2d 843, 847 (7th Cir.1988). Other factors which should be considered by the Court include whether "the government coerces, dominates or directs the actions of a private person," *Pleasant*, 876 F.2d at 796, citing *Coolidge v. New Hampshire*, 403 U.S. 443, 489, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971) (plurality opinion), and "whether the private actor performed the search at the request of the government and whether the government offered a reward." *Koenig*, 856 F.2d at 847, citing *Feffer*, 831 F.2d at 739–40.

Examining Bertrand's search in light of all of the surrounding circumstances, the Court finds that the defendant has not met his burden of proving that the nature of the action taken was governmental. Bertrand testified that he and Marousak stayed in his vehicle until the three suspects were taken from the premises, and only Sears remained. Sears entered the house to look for the earlier executed search warrant and for other persons, and Bertrand and Marousak followed him in. Both Marousak and Bertrand stated that Marousak had property in the house, and entered the house to check its condition. No witness suggested that Sears' motives

were otherwise, nor that he informed Bertrand that his motives were otherwise. Sears did not enlist the help of Bertrand to search. He did not suggest that Bertrand search. No incentive was provided and no coercion was exercised to facilitate a search. No evidence was presented that Sears even knew that Bertrand was searching, nor that he would or did acquiesce to such.

In fact, there is nothing in the record that indicates that the discovery of the glove was anything but accidental. The Court finds that in light of all of the circumstances, Bertrand was not acting as an agent or instrument of the state, and therefore his conduct is not prohibited by the Fourth Amendment.

 Finding that the search was private, however, does not end the Court's inquiry. Once Sears was given the glove, his actions were subject to Fourth Amendment scrutiny. The Supreme Court discussed the acceptable parameters of a search by a state actor after a private search or seizure, in *United States v. Jacobsen*, 466 U.S. at 115–21, 104 S.Ct. at 1657–61. The Court reasoned that "additional invasions of respondent's privacy by the Government agent must be tested by the degree to which they exceed the scope of the private search." *Id.* Thus, when a state actor does no more than repeat the private search and inspect what is in plain view, that search has not infringed on any legitimate expectation of privacy. *United States v. Walsh*, 791 F.2d 811, 815 (10th Cir.1986). The Tenth Circuit read *Jacobsen* as saying that once a privacy interest has been compromised by a private party, a state actor's actions which reveal no more than the private search do not violate the Fourth Amendment. *Id.*, citing *Jacobsen*, 466 U.S. at 121–22, 104 S.Ct. at 1660–61. The actions of Officer Sears in taking the glove and looking inside were exactly the same steps Bertrand had taken.

 Officer Sears' actions were not, however, limited to looking into the glove. He proceeded to remove its contents and seize it, revealing the paraphernalia and suspected narcotic. The Court must decide, then, whether seeing the end of the syringe in plain view gave Officer Sears adequate probable cause to seize the glove's contents. If the fruits of a private search, when given to a government agent, are in plain view, their seizure will not be violative of the Fourth Amendment. *See, e.g., United States v. Rodriguez*, 596 F.2d 169, 175 (6th Cir.1979) ("An object in plain view may be inspected and seized without a warrant if (1) the officer is lawfully present, (2) the object is in plain view, and (3) its incriminating nature is immediately apparent."); *United States v. Ford*, 525 F.2d 1308, 1312 (10th Cir.1975) (it is within an officer's province, when presented with the fruits of a private search, to determine whether suspicious substances in plain view are contraband); *United States v. DeBerry*, 487 F.2d 448 (2d Cir.1973) (when a private party's search puts contraband in plain view, that contraband is subject to seizure without a warrant).

 An object in plain view may be seized by an officer who is lawfully present in a particular place and if "there is probable cause to associate the property with criminal activity." *United States v. Silkwood*, 893 F.2d 245, 247 (10th Cir.1989), quoting *Texas v. Brown*, 460 U.S. 730, 738–39, 103 S.Ct. 1535, 1541–42, 75 L.Ed.2d 502 (1983). While a "bulge" in a glove may not give probable cause to seize the glove, Sears' view of the syringe certainly did. He testified that the syringe, suspiciously stuffed into a glove, indicated to him that it was probably drug paraphernalia. The Court agrees, and finds that the presence of the syringe in the glove gave Officer Sears adequate cause to seize.

 Sears entered the house at the request of Marousak, the owner, to look for any additional persons who may have been associated with the "burglary," and to assist Marousak and Bertrand in determining whether any of Marousak's property had been stolen or damaged. While a landlord may not generally consent to the intrusion by a police officer into the home of a

tenant, such was not the case here.[2]

## DISCOVERY OF THE GUNS

 The evidence concerning the discovery of the hunting rifle and pistol is uncontroverted. Sears and Wilson were directed to impound the vehicle by Green. Green testified that the vehicle was impounded only because its owner and occupants had been arrested. He further testified that the car was not evidence of burglary, nor was it impounded as evidence of burglary, the crime for which Donnes, O'Donnell and Welch had been arrested.

 It was suggested at hearing that at least one of the guns seized was in plain view on the floor, sheathed, in the back seat of the car. Both Sears and Green, the only officers who testified that were on the scene at that time, testified that they could not remember seeing the rifle in plain view. While it is easy to speculate that the sheathed rifle, lying on the floor in the back seat, was in plain view, this Court will not merely assume it was to fulfill the government's burden of proving that a departure from the warrant requirements is justified. Further, Sears testified that the presence of a sheathed hunting rifle was not suspicious. As noted above, before the plain view exception may be utilized, the incriminating nature of the object seized must be immediately apparent. The evidence indicates that it was not.

 The Supreme Court has recognized an exception to the warrant requirement of the Fourth Amendment for warrantless inventories of vehicles, conducted pursuant to lawful impoundments. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (plurality opinion). Of course, the government has

the burden of proving that any warrantless search meets the requirements of the exception. *Coolidge*, 403 U.S. at 455, 91 S.Ct. at 2032. The purposes of an inventory search are to protect the owner's property while the vehicle is in police custody, to protect the police against claims made by the vehicle's owners for lost or damaged property, and to protect the police from potential hidden dangers. *Opperman*, 428 U.S. at 369, 96 S.Ct. at 3097.

 A warrantless search of a vehicle pursuant to the inventory policy is only an exception to the Fourth Amendment warrant requirement if the preceding impound of the vehicle was lawful. *See, United States v. Maher*, 724 F.Supp. 1348, 1356 (D.Wyo.1989) and cases cited therein. An impound of a vehicle is a seizure, and thus must be done reasonably and pursuant to the Fourth Amendment. This Court has adopted the view, consistent with that of the Tenth Circuit, that the government must show that "a reasonable necessity prompted the impoundment." *United States v. Ibarra*, 725 F.Supp. 1195, 1200–01 (D.Wyo.1989), citing *United States v. Pappas*, 735 F.2d 1232, 1234 (10th Cir.1984).

In the present case, no reasonable necessity existed for the impound of the defendant's vehicle. The vehicle was parked on private property, where it was neither a threat to public safety nor an impediment to traffic. The officer who ordered the impound testified that the vehicle was not an instrumentality of the crime for which its occupants were arrested, nor was it evidence of that crime. Finally, the impound violated the provisions of the Sheridan Police Department policy on impounding vehicles. That policy provides that,

---

**2.** One requirement for the admission of evidence seized in plain view is that the officer be lawfully present in the place where he sees the contraband. This requirement functions to deter police intrusions into areas, protected by the Fourth Amendment, for the purposes of looking for suspected contraband without probable cause. Whether Sears was lawfully present in the living room at the time he peered into the glove is a point of contention.

Regardless, suppressing the evidence in this situation would do nothing to fulfill the purposes of the exclusionary rule. While it may be true that Sears should have obtained a warrant before entering the house, his entry of the home did nothing to facilitate his view of the syringe and contraband in the glove. Though Sears did enter the house, and was subsequently given the opportunity to see the contraband inside the glove, he did not get that opportunity by virtue of his being in the living room. There is no nexus between the alleged illegal entry of Sears and his viewing the materials inside the glove.

when the owner or driver of a vehicle is arrested, the arresting officer is to first give the owner or driver a choice to lock and leave the vehicle, or second, to allow the driver to have the vehicle towed by a wrecker of his choice to any location. Neither of these options were given to the suspects in this instance.

 What is particularly troublesome to the Court in this case is Lieutenant Green's testimony concerning the reason for impound. He apparently had reservations regarding searching the vehicle without first obtaining a search warrant, and contacted the Sheridan county attorney in that regard. Green testified that the county attorney advised him not to obtain a warrant, but instead to impound the vehicle and search it pursuant to an inventory. It would indeed be tragic if the warrant requirement of the Fourth Amendment could be so easily circumvented and if those persons sworn to uphold and enforce the laws could just as easily ignore constitutional safeguards because of administrative inconvenience. An inventory search of a vehicle is not a weapon to be used by law enforcement to contravene the constitution by nullifying the warrant requirement. It is an exception to that requirement only to the extent that it is done pursuant to the valid purposes outlined in *Opperman,* and only if done according to standard criteria. *Colorado v. Bertine,* 479 U.S. 367, 375, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987). As the *Bertine* Court found, "[n]othing in *Opperman* or [*Illinois v.*] *Lafayette* [462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983)] prohibits the exercise of police discretion [to impound a vehicle] so long as that discretion is exercised according to standard criteria and *on the basis of something other than suspicion of evidence of criminal activity.*" *Bertine,* 479 U.S. at 375, 107 S.Ct. at 743.

The evidence elicited at the hearing on this matter indicates that the impound was suggested as an investigatory measure, and on the basis of suspicion of evidence of criminal activity. The Fourth Amendment will not tolerate such an intrusion.

## CONCLUSION

For the foregoing reasons, the Court finds that the defendant's Motion to Suppress with regard to the admission of the narcotics found in the house at 162 Montana should be and is DENIED.

The defendant's Motion to Suppress the evidence obtained in the inventory search of the Ford Galaxy should be and is GRANTED.